The afternoon is Schmoldt & Daniels v. 723 S Neil. You may proceed. Thank you. Good afternoon, Justice Harris, Justice Abbott, and Justice Polk. Your counsel. May it please the Court. My name is Rick Iles. I am a partner in the murder of Martinkus Colvin Champagne. I represent the appellant in this case, 723 S Neil Street, LLC. An Illinois limited liability company owned by Janet Newman and Barry Newman. It has been said, one great use of words is to hide our thoughts. The case before you today is the Polk v. Child v. Axson. This litigation arose from a dispute that sprang from a series of brief proposals for Masonry. Those three proposals are set out in the record as Trial Exhibit 5. All three proposals were prepared by the plaintiff, or by the plaintiff's agent, Brett Seward, to testify to trial. The first proposal was presented to the defendant, Janet Newman, and it was a proposal to do certain work on a commercial building for a flat fee of $122,000. That proposal was rejected because it was too expensive. So the plaintiff prepared and submitted a second proposal, a revised proposal that reduced the scope of work, and that proposal came in at a flat fee of $93,500. That proposal as well was rejected by Janet Newman because it was too expensive. So the plaintiff set out to prepare a third proposal. A proposal that ended up being the contract that the court determined to set out in relationship with the parties of trial. That proposal, again, reduced the scope of work, and it provided, we propose to complete the above masonry project on a time and materials basis, per plan, with a not to exceed $80,000 budget. It is this proposal that was accepted by Janet Newman when she signed it. The lower court found that this proposal, after being signed and after becoming a contract, was ambiguous, and that's the first error I'd like to discuss today. This is the second point raised in my brief, if you're looking at my brief. The lower court found that the term with a not to exceed was ambiguous. Judge Leonard felt that when the proposal said with a not to exceed $80,000 budget, he couldn't tell what that meant, so he looked to extrinsic evidence. Now, the primary objective in interpreting a contract is to give effect to the intent of the parties, using the plain and ordinary language that they put forth in the contract. The fact that parties disagree on the meaning does not create an ambiguity in and of itself. The issue is whether the contract language is reasonably susceptible to more than one meaning. Counsel, can I ask you a question on the facts? Sure. When you were reading that contract provision, it struck me that it said, not to exceed $80,000 for the masonry work that's the subject of the agreement. But it seemed to me in reading the briefs that Janet Newman went to them and asked them to do additional work that was outside of the scope of the agreement. Is that correct? Well, that's correct. Is that undisputed? As a caveat, I was not the trial attorney, so a lot of what I know from this comes from the record, just as what you're looking at. But the evidence at trial did indicate that there were things that the contractor was calling extras, things that he says that Janet Newman asked him to do that was outside the scope of the original proposal. I don't think there was ever a determination on a lot of it as to whether or not Janet Newman actually did have these conversations or when she had these conversations. There was an exhibit that was introduced into evidence. The email? A September 30th email. She never disputed that? The architect forwarded it to her? Correct. She never responded to that. But I think the point on that issue, and I can go ahead and skip to that now, when you deal in construction contracts, a lot of times you have change orders. When you have change orders, you can change the scope. You can change the time. You can change the payment terms or the amount of payment. And since this contract had a high end or a cap of $80,000, you can also change that cap. The only evidence at trial that Judge Leonard chose to rule in favor of the plaintiff on with respect to these extras was evidence that Brett Seward said a lot of these things were requested by Janet Newman, and they were outside the scope of the original contract, either the scope of Exhibit 7 or the scope of the project drawings. Did she deny doing that? At trial, I believe when she was asked pointedly about some of the issues, she did not recall. But be that as it may, let's assume that she admitted that she was told there was going to be this extra work and that she agreed to the extra work. That only gets you partway there. When a contractor is requesting recovery on a change order, the contractor has the burden of showing by clear and convincing evidence that the owner requested it, what the cost was, that the owner approved the cost. And in this case, since we're dealing with a cap, the contractor would also have to have evidence that the owner agreed that the amount billed for the extra work could go above and beyond the cap. In other words, that the owner agreed to increase the cap. Now, I cited to an Indiana 4th District Appellate Court case of persuasive authority on this issue. Quite frankly, it was the closest case I could find that dealt with the issue we have here, which is when you have a contract that has a cap, if the contractor is trying to get recovery for extra work, there has to be some evidence, not only that the owner approved the extra work, and even not only that the owner agreed to pay for the extra work, but an additional element that the owner agreed that the extra work could exceed the cap. Or in other words, the owner agreed to increase the cap. The TRW case I cited was a case involving a commercial structure. There was a written contract that had a guaranteed maximum price. The contractor agreed to build walls for the structure using a very unique system of construction. As it turns out, the contractor could not get the walls built as cheaply as it had anticipated. At the end of the contract, the contractor tried to recover tens of thousands of dollars more than the guaranteed maximum price. At trial, the trial court ruled in favor of the contract. On appeal, the appellate court said this contract had a guaranteed maximum price. There was no evidence that the owner agreed that the contractor could exceed the guaranteed maximum price. As I understand it, in this case, the owner decided to use her own workmen for part of the project, cleaning brick. Correct. And that didn't work out so well. Yes. I think that's fair to say, sure. So here the contractor says, okay, we're supposed to be doing this, redoing this building with used brick that's supposed to be clean, but it isn't. Now what do we do? And I think in this case... Walk away? Well, no. In this case, I think what happened is the contractor used its own employees. Okay, so this is a situation that should be analyzed under a traditional change order. The scope of work changed. The scope of work that was outlined in Exhibit 7 included a clause that said that the owner was providing certain services. As they got into it, the contractor decided it would have to provide those services. So that's increasing the scope of the original contract. But he sent an email to the architect. He sent an email on September 30th and said, there are certain things that Janet has requested. I just want to send this out in hopes that our efforts will be appreciated when this job's over. If he knew he had the right to be paid for all of it, what is he hoping for? Was he going to do it for free? No, I don't think he intended to do it for free. But what I know he didn't do is he didn't get the owner's consent either to the price or to increase the cap. What did the architect say in response to the email? I think the architect forwarded the email on to Janet, and I think the architect said, Janet, here are some items that I believe are outside the plans. They appear to be in order. The architect's testimony was that he never recommended her to pay any particular price for those things. His testimony was also that he always recommended to the contractor to do any change orders in writing. That's one of the reasons we're here today. We're here because we have a contract that was drafted by the contractor that had a meaning that was hidden and known only to him, which was that it was a straight time and materials contract with an unlimited ceiling. Well, it seems perhaps that it might not have been such a reasonable position or a reasonable expectation on Ms. Bubin's part that the contractor would be doing all of this extra work at her request, or at least there's evidence to support that, that these additional jobs were at her request, that the contractor would do those jobs which were not set forth in the original proposal, and that Ms. Bubin would just continue with the expectation that there would be a maximum amount recoverable of $80,000. I mean, if you have someone who apparently is knowledgeable, such as Ms. Bubin, at least that's what the trial court thought, is it reasonable when you have a time and materials contract to greatly exceed the scope of the work set forth at the request of the owner and still expect that the budget figure, and it is a budget figure, it uses the word budget, would be maintained? Is that reasonable? Well, in this case, I don't think it's unreasonable for Ms. Bubin in her situation when the contractor is saying, I need to do this work, she's not sure if it's inside the scope or outside the scope. I think actually her testimony, as I said, in one instance she couldn't recall if she knew they were doing some of this brick work, but when she got the email, I think that's really the first time that she would have been made aware that some of these things are claimed to be outside the scope. Well, let's assume they're outside the scope of Exhibit 7, okay? Exhibit 7, as it's crafted, is a time and materials contract with a not-to-exceed $80,000 budget. It's not a straight time and materials contract. Now, I know that's what Mr. Seward testified to, and I know that's ultimately what Judge Leonard found, but I strenuously disagree with that whole thing. Janet Bubin was given a proposal for $122,000. She rejected it because it was too expensive. That's undisputed. She was given a proposal for $93,000. That was rejected because it was too expensive. That's undisputed. So she's given a third proposal. Now, Mr. Seward says that had no cap. That was unlimited. Straight time and materials. The sky's the limit. That doesn't make sense. It doesn't make logical sense. He also testified that this proposal would mean the same thing if you removed the words not-to-exceed. When you undertake contract construction, although I lost it, you have to try and give it construction that gives meaning to all the words used in the contract. The only construction of this agreement that gives meaning to all the words used would be the construction of Janet Bubin, the construction of the architect, and the construction of the plaintiff's own expert witness, James Lee. So under what basis was this additional work done? Are we talking about subsequent separate all contracts? That's the analysis the lower court undertook, yes. Is that what you would agree with? I would agree that if there was extra work that was done outside the scope of the original agreement, with the consent of Ms. Bubin, the contractor would also need to get her consent on a price. And setting that aside, let's assume she agreed to pay a reasonable amount. They still have to show that she agreed to increase the cap. Now, since we have two methods of billing on this, time and materials up to the cap, it's very plausible that the contractor could have got their work done. And in fact, I believe there was testimony from Mr. Seward. He understood cost was a factor for her. So under a time and materials, she may not have spent $80,000. It may have only cost $65,000 or $70,000 to do this work. She had an opportunity to save money further below even the $80,000 that was plugged in here. It depended on how well her workforce was able to perform. So when she's agreeing, for the sake of argument, if she's agreeing to expand the scope of the work, really all that's saying is she's now allowing the contractor to do additional things and to bill on a time and materials basis for those things, even though they weren't originally set out to be set. So if the original work was going to come in at $65,000, she's now given them permission to bill on other items up to an additional $15,000. But she still has a cap in this agreement. So I don't think there's anything inconsistent with her agreeing to allow the contractor to bill for other things to expand the scope of the project. But the contractor never discussed with her increasing the cap. And I believe there's even testimony where Mr. Seward said he didn't even talk to her about the price. Had he just talked to her, hey, Janet, this is extra work. And by the way, that $80,000 is going to go up. I mean, if he just had that conversation, that now puts her in a position to control her costs. As it turns out, she has an agreement that she believed had an $80,000 cap. Her architect believed that it was an $80,000 cap. And the plaintiff's own expert testified had an $80,000 cap. Let's talk about the architect for a minute. I presume you would agree that the architect is the agent of the owner. Yeah, sure, in certain respects. So the architect gets a communication from Evans Mason saying, her people aren't doing the job in terms of cleaning the brick. We're going to have to go ahead and do it. Did the architect ever respond to that? I don't recall any testimony in the transcript that addressed that particular issue. I'm sure if counsel knows that it's in there, he'll be able to point it out. I do know that there were things discussed in the email, and the architect testified that he didn't have the authority to approve a cost. All he was doing was telling Ms. Booga when he sent it to her that he believes that those things said in the email would have been things that were outside the original scope. So my first point of error is I believe the court erred in finding that an ambiguity existed. I think if you look at the plain meaning of the words used, there is no ambiguity. Sure, Mr. Seward doesn't believe that the term not to exceed meant anything. He doesn't think that added anything to this agreement. So his construction, and the court's construction, requires the court to disregard language that was put in its contract. But the construction of Dan and Boo, and the construction of the architect, the construction of the plaintiff's expert, all agree that based on the words used here, it's a hybrid contract. It has a time and materials component with an $80,000 cap. So I think that the court's first error was finding an ambiguity, and I would ask this court to reverse the lower court. And I think this court I would invite to go ahead and enter judgment. For the remaining $5,000 that's owed, she paid $75,000. She should be entitled to the cap of $80,000. She owes another $5,000. Beyond that, I would ask the court to find in my client's favor on the issue of extras, because, again, there is no evidence, no evidence, that she was ever asked about the cap, or about increasing the cap, or that she ever agreed to increase the cap. Finally, the final issue I raise, and I agree, because if this court is not inclined to find that the Exhibit 7 was unambiguous, then I don't think we've got a meeting of the minds at all, because Janet Boob and Neil Strack and James Lee all said this was a time and materials with a cap. The other parts of the contract said this is not a cap. This contract isn't a cap at all. That's a pretty material issue, not to have some agreement. Thank you. Thank you. We'll have additional time in rebuttal. Mr. Spooner. Good afternoon, Justices Harris, Appleton, and Pope. My name is Scott Spooner. I represent the athlete in this cause. My colleague, Mr. Bonsack, also represents the plaintiffs, who I'll refer to throughout today's presentation as Evans Mason. I should also indicate that Mr. Lester Mason is with us here for today's argument. In my presentation to your honors, I want to focus on two things. I'd like to summarize what I regard as the most important exhibits that were introduced and admitted as evidence during the course of the trial, and then I'd like to go from that to a discussion of the Watson-Lumber v. Brunelig decision from the 5th District Appellate Court in 1967 and this Court's consideration of that five-part standard, as at least I understand it, in its decision in Stark Excavating v. Carter Construction Services. Preliminarily, I should indicate that, in my view, the most important exhibits that were introduced and then admitted as evidence during the course of the trial are Exhibit 7, which is the disputed contract document dated July 31, 2008. Exhibit 9, which is the string of emails that passed between the defendant's architect, Mr. Strack, and the plaintiff's agent, Mr. Seward, on September 30, 2008. Then Exhibits 11, 12, 13, and 14, which are the invoices which Evans Mason sent to Ms. Blumen or to 723 South Neal, LLC, during this course of its construction activities. And then finally, Exhibit 17, which I think I can assist the Court here by indicating, I think because of an oversight at the lower court level, the original of which is probably still sitting in the closet of the Champaign County Courthouse somewhere, but those are the architectural plans and specifications for this project. The reason I make reference to this handful of exhibits is because when we examine Exhibit 7, I think what you'll find is that it makes explicit reference to the masonry contractor's portion of the designated work when it makes reference to sheets S1.1 through S1.4 and the architectural sheets A1.1 through A12 dated July 3, 2008. And Mr. Strack, in his testimony, acknowledged that some of this extra work was certainly not as specified in his architectural plans and specifications. It then enumerates nine specific items that are to be performed pursuant to the July 31, 2008 contract. And those are listed. We begin with cutting out and tuck-pointing per the plans, all demolition of masonry walls per our scope of work, all toothing required for masonry openings, all masonry lintels supplied and installed per plans. The cleaning of existing brick would be done by others. This is the workforce that has gained such prominence during the course of this controversy, but would be installed by Evans Mason. And then all patching of sill and stone and waterproofing. Now, as we know from the record that's on appeal that was developed at the trial court level, this was a proposal that went through two different variations prior to July 31, 2008. We also know from the testimony of Mr. Seward, and I think it's been acknowledged by Mr. Strack and Ms. Boone, is that there was a fairly consistent reduction in the scope of Evans Mason's work as the masonry contractor. Without question, the single most important reduction in the original and second proposals that were made by Evans Mason to 723 South Neal was that the brick that was on the exterior of the building would be cleaned through a labor-intensive and skilled operation conducted by a workforce, a workforce consisting of three individuals who were employed directly by Ms. Boone. That was far and away the largest single item that led to an increase in the cost that in my judgment should be borne by 723 South Neal in this case, because it was that task that was failed on the part of that three-person workforce that had to be performed by someone because that was the entire object or objective of this project, that we would take old brick, clean it by taking a trowel and knocking off the masonry or the mortar and then soaking it in a chemical solution and then reinstalling it for aesthetic purposes on the interior of the building as well as on the exterior of what was known as the White Line Laundry Building. Now, this same Exhibit 7 includes four exclusions. I've already mentioned one, that the cleaning of the brick would be performed by Ms. Boone's workforce, and then it excludes power washing of the facade, excludes dumpsters, any work and materials for an elevator. And what's notable about Exhibit 7 when we review the entirety of the record is that these exclusions are inherent to the document that Ms. Boone calls her contract. Once again, there was to be no cleaning of existing brick for reuse performed by Evans Mason. Number two, there's absolutely no reference in Exhibit 7 or in any testimony that was adduced at trial court level that Evans Mason would be responsible for the installation of steel lentils. Number three, there's no reference in Exhibit 7 to the replacement of steel I-beams. And as you're going through these, these items that you're talking about now that are extras, are they covered in these cover sheets, S1.1 through S1.4 and the architectural sheets? Not for the masonry contract, no. In fact, to answer your question, Justice Harris, in a more focused fashion, the steel lentil problem, when you call it that, was something that was discovered during the course of the work on this project as an overall project. It was something that was in urgent need of repair. And it's my assessment that what happened was that Evans Mason happened to be the contractor that was most prominent on the job scene when it was discovered, and therefore undertook at the direction of Ms. Boone to repair the steel lentils lest they fall and create an even larger problem. And to answer your question, none of the things that I have just enumerated were in the masonry contractor's specifications or the architect's plans for the masonry work on this project. All right, thank you. And then one other thing. The items that are indicated below scope of work on Exhibit 7, are all of those contemplated within the cover sheets S1.1 through S1.4? Yes. Are they exclusions? Okay. There are other things contained in S1.1 through S1.4? Yes. Okay. Yes. And then to finish my enumeration of the excluded items, there is to be no removal of signage from the building performed by the masonry contractor. And finally, and I think this is also a prominent deviation from the normal masonry contractor's work, there is to be no pouring of concrete foundations. All of these things, however, were ultimately performed by my client, Evans Mason. And they were performed at the direction of either Janet Woodman or her representative at the job site, her agent, her architect, Mr. Neil Strachan. Now, I mentioned Exhibit 9 as another of the more prominent exhibits that I think is worthy of discussion. And we know what Mr. Seward advised Mr. Strachan of at 3.33 p.m. on September 30, 2008. What I think is notable is that a mere 12 minutes later, Mr. Strach not only forwarded Brett Seward's 3.33 p.m. email to his client, Janet Woodman, but he did so by writing as follows, quote, Janet, I have reviewed this work and it is in order. This is not work that was indicated on the drawings or was in the mason contractor's bid. It should be presented by the contractor as additional work. I think that's dispositive, quite frankly. What I note is later, during his testimony at the trial of this case, which occurred five years after the fact, Mr. Strach came up with this requirement that appears nowhere in any of the contract documents that he assumed that Evans Mason would submit change orders for this extra work. Yet we can read Mr. Strach's email to his client, Janet Woodman. He doesn't make reference to a change order. He doesn't make reference to a specification that requires the submission of a change order for this extra work. Again, I think we can rely on the documents that were contemporaneous with the actions taken by the parties here. And back in September of 2008, Neil Strach was advising his client that this $21,000 worth of extra work was in order and that it should be recognized by his client, Ms. Woodman, as additional work. Now, Janet Woodman effectively ratified this extra work when she made payment on invoices that were submitted on and after September 30th of 2008. And specifically, what I'd like the Court to consider is that Ms. Woodman made payment back on October 5th of 2008 in the amount of $20,000 and again on November 6th of 2008 in the amount of $15,000. And not once did she object to the invoices that included the very extra work that is specified in Mr. Seward's email of September 30th of 2008. That brings me, if I can, to a discussion over a brief of the Watson-Lumber v. Grenewick case from 1967 and this Court's consideration of the five factors that arise under Watson as described and discussed in the Stark Excavation v. Carter Construction Services case. It is my view, members of this Court, that the Watson standard has been conformed in the conduct of Evans Mason. Item number one of the five-part analysis is that the work was outside the scope of the contractor's promises. Well, we know that from the September 3, 2008 email from the owner's agent and architect, Neil Strack. Number two, the extra items, according to the Watson analysis, were ordered by the owner. Again, the email, which is unrebutted, Janet Woodman may conveniently fail to recollect reacting to the email, but she certainly didn't ever protest the performance of this extra work. And as I've already indicated, she paid, at least in part, for some of that extra work when she paid on invoices that were submitted after September 30, 2008. Item number three in the Watson analysis, the owner agreed to pay extra either by words or by conduct. Again, I refer to Ms. Woodman's payment of invoices that were submitted after Mr. Seward's September 30, 2008 email. She paid, in fact, $35,000. She was never fully paid, even for the work that was specified in exhibit number seven, because in Janet Woodman's world, it's acceptable to take the benefit of someone else's labor and construction efforts without having an obligation to pay. And yet, that was contradicted during cross-examination when I called Ms. Woodman as an expert witness, and I asked her, is it your experience that contractors perform work, and they do so without the expectation of being paid? And she acknowledged, no, that's not my experience at all. Item number four in the Watson analysis is that the extras were not furnished by the contractor as his voluntary act. Again, I think the more prominent example here is not only the cleaning of the brick, which was originally intended to be performed by this three-person unskilled work crew, but the pouring of concrete foundations. I don't have any experience in the construction industry, but that strikes me as odd that a masonry contractor would be pouring concrete for foundational elements of the structure on which they're performing masonry work. But again, this was ordered by Ms. Woodman, and the work was accepted. It was acknowledged as being necessary. And the only quarrel we have here, in my judgment, is that Ms. Woodman expects work to be performed without having the commensurate or concomitant obligation to pay for that work. And then lastly, item five in the Watson analysis is that the extra items were not rendered necessary by any fault on the part of the contractor. Here, there is absolutely no evidence that anything that Evans Mason did throughout the entirety of their construction activities at the White Line Laundry Building required or necessitated their performance of extra work. In other words, they didn't screw something up that required them to charge extra to rectify their follow-up at the construction site. No evidence of that whatsoever. I note that this Court, in its start excavating decision from 2012... Excuse me. Before you leave the Watson lumber case, I'm just curious of your thoughts on one aspect of it. You went over the five elements, but the Court goes on to say that proof of those elements needs to be by clear and convincing evidence. We're basically talking about an oral contract in Watson. Why should the burden of proof be more than a preponderance of the evidence? Does any other case suggest proof need to be by clear and convincing evidence? I found no decision authorities to that effect, Justice Harris. I don't understand why that would be required here, although I will comment to this extent. Here, there was no evidence to the contrary. There was only the convenient denial of Janet Blumen five years after the fact that I never ordered these things or I don't remember doing that. I think when you review the testimonial record from the trial in August of last year, what you find is that when Ms. Blumen was confronted with some uncomfortable realities, her reaction was typically that she couldn't recollect, that she couldn't remember, that she didn't remember that. And then I confronted her further by saying, well, you're not saying that didn't happen. You're just saying you don't remember. That's right. Well, that's tantamount to clear and convincing evidence when you don't have any counter evidence aside from I can't remember doing that. That's not evidence. That's just lack of recollection. I'd like to quote from this court's consideration of the Carter decision when it quoted with approval the following. It says, the owner has a right to full and good faith performance of the contractor's promise, but has no right to expand the nature and extent of the contractor's obligation. Here we have a non-integrated contract. It's something that probably amazes and is found abhorrent by most transactional attorneys in terms of the lack of precision of this one-page document that was the contract of July 31, 2008. But according to Ms. Blumen, this was their contract. What Ms. Blumen insists on ignoring was that there was an $80,000 budget as long as she upheld her part of the bargain. And central to that part of the bargain was her use of this three-person workforce to perform a very skilled and labor-intensive task. I want to point out something that wasn't mentioned in either the briefs or in my opponent's presentation today. Brett Seward testified that not only did this three-person workforce fail in their efforts to clean the brick for reuse in the building, but because they destroyed so much of that brick, he had to spend a day going out to various companies over in east-central Illinois looking for brick that would match the brick that had been destroyed by the three-person workforce. I also want to point out that Mr. Seward testified that because there was no competent oversight, because the owner essentially served as her general contractor, you had scheduling difficulties. These were endemic throughout the construction activities of not just Evans Mason, but apparently all of the contractors. And you'll recall that during the trial he testified that, for instance, we would start work in one area of the building and suddenly we'd have to pull our workforce away from that area of the building to let some other craft come in, the carpenters or the stonemasons or someone, so that they could perform their work. And so we're just standing around because there was no competent scheduling or coordination of the various contractors' activities. Members of this Court, the Stark Excavating case is, I think, very different in this case in this sense. In that case, you had an explicit contractual provision that made reference to the prohibition against extra work. That's not the situation here. In that case, the similarity between Stark and this case is that in Stark, the general contractor, Carter Construction Services, knew that this winterizing work was being performed by the concrete contractor. Knew that and knew from his experience and expertise that that was going to cost extra, and the concrete contractor, Stark Excavating, expected to be paid for that. The similarity with this case is that Ms. Booboo knew that not only was this extra work, not only was this work that was way outside the scope of the masonry contractor's plans and specifications, but she accepted the benefit of their efforts without acknowledging her obligation to pay for those. Those are all my comments to this Court. Thank you. Thank you, Paula. Briefly, on that last point, again, Janet Booboo got the email, and it was September 30th, and at that point, her architect is telling her these things are outside the scope. I don't think there's any evidence, but before that, whether or not she asked certain things to be done, that she knew it was outside the scope of her agreement. Furthermore, she knew in terms of getting invoices, she knew she had at the most an $80,000 contract. So I don't think there's anything wrong with her paying invoices. She testified that she had some questions about the invoices. She kept calling the office. She was told that, you know, we've got to go ahead and bill for this. She made payments that she felt were fair, but she was concerned as these invoices were coming in. That's in the record. Now, with respect to the testimony of Mr. Seward, there is testimony in Volume 2, page 50, where, again, this issue of was the $80,000 a cap or not, and did it depend on the brickwork being done. Well, that was discussed, and he was asked on cross-examination, Is it your testimony that you explained the phraseology tying the materials to Janet Bubin? His answer was yes. Question, did you explain or did you and Janet Bubin have discussion about the not-to-exceed number? Answer, yes. What did you tell Janet as to, well, let me ask it this way. Did you tell Janet that the masonry work would not exceed $80,000? Answer, as long as her people could supply what she was required or that she could supply during the conversation, yes. So right here, he is confirming that there was a not-to-exceed figure in the contract. Question, you didn't include that in the proposal, however? Answer, didn't include, excuse me? Question, you didn't include that in the proposals, however? Answer, include what in the proposals? Question, that the not-to-exceed number was based on a condition that certain other work would be done by what you refer to as her people? Answer, no. But isn't that part of the understanding when Exhibit 7 lays out what they are supposed to do, and then she's coming and asking them to do other things? Well, again, to the extent that she's asking them to do things, whether or not she understands that's outside the scope... Well, she knew that the brick cleaning was outside the scope. She knew that her folks were to do the brick cleaning, yes. And that's one of the responses where she couldn't recall if she was ever told that her people had been kicked off the job and they were using their own employees. But again, even if she understands that it's outside the scope, she knew they were building on a time and material basis, and she still thought she had the benefit of having a cap. There's no testimony, no evidence was put on in the lower court that that conversation with her ever occurred, whether or not she would agree to pay any amounts above the cap. This contract was unambiguous, and to the extent there was an ambiguity as to what the language not to exceed $80,000 meant, it's an ambiguity that was caused by the drafter. And the lower court never undertook any analysis of construing it against the drafter. When you have the architect that agrees that that contract had a cap in it, when you have the plaintiff's own expert agreeing that that contract had a cap in it, when you have Janet Boogan believing it had a cap in it, when you have the testimony of Mr. Seward himself that I just read acknowledging it had a cap in it, how could the court find that there wasn't a cap in it? If your client's people, the three guys, tried to clean the brick and destroy the brick, what was Evans-Mason's to do? Walk off and leave like a part of a wall just gone? No, sure. I understand what you're saying. Approach it like any other change order. And apparently they were putting their own folks on the job, but no discussion was ever had as to whether or not that was going to increase the total price that she was going to have to pay. Counsel said that most of the extra work was for brick cleaning. Now, they billed over $140,000. I think $146,000 or $149,000 is what the ultimate judgment was for. But yet that brick cleaning was in the very first proposal. All of it. All of that brick cleaning was in the first proposal. And what was that contract price? $122,500. So I don't think this court can allow this agreement that was drafted by the plaintiff to be deemed to be ambiguous and allow the plaintiff to recover almost twice the price that he agreed would be a cap. And we plug that language in there to entice her to sign it. I think she was reasonable in her belief that the contract provided her with that protection. And I would ask this court to reverse the vote. Thank you. Thank you. We'll take this matter under advisement to stand recess until the readiness of the next case.